## THE SAO PAULO.

### (Circuit Court of Appeals, Second Circuit. June 14, 1913.)

#### No. 194.

SHIPPING (§ 132*)—DAMAGE TO CARGO—LIABILITY OF VESSEL—EVIDENCE CONSIDERED.

Evidence considered in a suit to recover for damage to a cargo of Brazil nuts by heating or burning on a voyage from Para to New York, and *held* insufficient to establish negligence on the part of the vessel in stowage or ventilation, or in failing to shovel the nuts over during the voyage in the usual manner; it further appearing that they were subjected to worse conditions when being brought down the Amazon in river steamers and that the injury might have been sustained during that time.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*

Liabilities of vessel owners for loss or injury from improper stowage, see note to The Gualala, 102 C. C. A. 553.]

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty by William Hills and William Hills, Jr., against the steamship Sao Paulo, Lloyd Brazileiro, claimant, for damage to cargo, and cross-libel for freight. Decree for respondent, and libelants appeal. Affirmed.

These causes come here upon appeals from decrees of the District Court, Southern District of New York, dismissing libels which were

brought to recover damages to consignments of Brazil nuts through heating or burning, which it is alleged were caused by reason of the "fault and negligence of the steamship Sao Paulo."

The following is the opinion of the District Court, by Hand, District Judge:

This is a libel in rem in the admiralty against the Steamship Sao Paulo under a bill of lading of a cargo of Brazil nuts consigned from Para to New York. The libel is based upon the negligence of the carrier in failing to take care of the nuts, on account of which they were damaged in the voyage. The ship cross-libels the libelants for the freight, no part of which has been paid.

A firm of brokers in Para, named Gruner & Co., bought the nuts there on the 8th day of June, 1910, on behalf of Poel & Arnold in New York and for the account of the libelants, and consigned them to the claimant, Lloyd Brazileiro, to be shipped on the steamer in question. The ship left Para on June 8, 1910, and reached New York on June 20th. The bill of lading did not recite that the nuts were received in good order and contained affirmative exceptions against any damage except from lack of care, bad stowage, etc. The libelant concedes that it must prove that the nuts were injured through the negligence of the ship itself. On arrival and discharge of the nuts at the Bush Terminal Docks in Brooklyn, N. Y., on the 21st and 22d days of June, 1910, it was found that they were in bad condition and that a certain percentage, which it is not now necessary to ascertain, had been, in the language of the trade, "burnt" or "cooked." Although there is some vagueness in the testimony as to just what this process is, the most reasonable interpretation seems to be that, as the meat of the nuts is extremely oily, their decomposition, which starts spontaneously, creates heat, and this heat will generate a vapor or steam, the nuts being usually moist, and, if this steam be not released, it will in turn accelerate the decomposition of the nuts, which find in the moist and heated atmosphere the best surroundings for decay. The precautions used in the care of the nuts are all devised to relieve them of the moist vapor so created. It is conceded that, when the nuts are surrounded by dirt and have become wet, the mud so created greatly increases their liability to spoil. From the testimony it also appears that the cargo in question was somewhat more dirty than usual because of the fact that the nuts were taken toward the end of the season when the trade does not expect them to turn out so well and when they are more apt to be covered by dirt.

The nuts are gathered from the forests bordering on some of the smaller tributaries which empty into the Amazon river from the north about 800 miles from its mouth. The natives gather them and carry them in canoes to well-known gathering places, where they store them on the shore generally on a rough platform covered with a roof of leaves or sometimes on the shore itself. The river steamers leave Para, ascend the Amazon, and stop at various places on its tributary, the Trombetas, taking on board the nuts as they find them. These they, for the most part, put into the holds, carrying the balance upon deck. Usually the last stopping place for gathering nuts is Obidos, but some of the nuts in the case at bar were taken by one of the river steamers between 50 and 100 miles further down. After they are carried to the mouth of the Amazon they are discharged from the river steamer and put into lighters and then loaded into the holds of steamers plying either to New York or Europe.

It is while lying in the hold of a steamer that the nuts are peculiarly subject to become "cooked," as already mentioned, so that there are several well-recognized precautions adopted to prevent it. These are substantially three: First, the hold is not to be loaded too full; second, an abundant supply of fresh air is continuously injected into the hold and the hot air allowed to pass off; third, the top of the nuts is continually furrowed by spading, so that the heat generated in the lower part shall escape and the crust which would otherwise form shall be continually broken up. The first of these requirements is met if a headroom of four feet between the ceiling of the hold and the level of the nuts is maintained. The second is insured (a) by keep-

ing the hatches always open except when absolutely necessary to close them through stress of weather, and in case of rain by building awnings over the hatches, and (b) by always carefully turning the fixed iron ventilators into the wind and supplementing with sail ventilators the standing ventilators, as will be hereafter mentioned more in detail. The third requirement is answered by sending men, at least once and usually twice a day, into the holds to run furrows two or three feet deep in the surface of the nuts, first forward and aft, then athwartships. If all the precautions be observed, it is not unusual to deliver the nuts in New York in a less heated condition than they were received at Para.

The greater number of the nuts in question were gathered along the bank of the Amazon river and its tributary, the Trombetas, during the month of May, 1910. Nothing is known of the particular antecedents of this special cargo before it reached the river steamers, Sapucaia and Perseveranca, in which the nuts were brought down the Amazon to Para. The Sapucaia left Para on May 7th, passed Obidos, the mouth of the Trombetas, five days later, and began to load nuts shortly thereafter. The Perseveranca was three days behind her. Each vessel had received all of her nuts some four or five days before she reached Para, where the Perseveranca arrived on June 1st and the Sapucaia on June 2d. The greater part of the nuts had therefore been in the holds of the two steamers for a period of from one to two weeks. In the harbor of Para they remained in the same hold from the date of the arrivals, June 1st and 2d, until the discharge began, which was on June 4th. There were two holds and no 'tween decks in the Perseveranca in which the nuts were stored; a forward hold having a capacity of 16,800 cubic feet and an after hold with a capacity of 6,800. Each hold was divided amidship from keels on to ceiling by a solid partition, so that in fact the ship had four holds, two forward and two aft. Into each of these holds there opened a hatchway which was located within a few feet of the vessel's rail. The ventilation in each of the forward holds consisted of one cowl ventilator 16 inches in diameter and one mushroom exhaust ventilator. The cowl ventilators each went down to within about a foot of the bottom of the hold. In the after hold there was the same ventilation except that instead of two 16-inch exhaust ventilators there was one 18-inch ventilator, which was exactly divided in two by the fore and aft partition already spoken of. The holds of the Perseveranca were kept open during the trip and the common sort of sail ventilator was put into each hatch.

The Sapucaia had a forward and after hold like the Perseveranca and no 'tween-decks; the forward hold having a capacity of 11,600 cubic feet and the after hold of 9,400. Like the Perseveranca also, each hold of the Sapucaia had two hatches near the sides of the vessel 4½ feet by 12 feet. The forward hold was divided fore and aft by a partition running amidships from keelson to ceiling, and another partition athwartships, cutting the hatches about in two. The after hold was divided by a fore and aft partition only. The ventilation in the Sapucaia for the forward hold consisted of a 12-inch cowl ventilator and a 12-inch exhaust ventilator aft and in the after hold the same. However, owing to the partitions just mentioned, both port divisions of the forward holds of the Sapucaia were without ventilators, and on the starboard partitions the forward one had one cowl ventilator going down to within a few inches of the bottom of the hold, and the after starboard division had only the exhaust ventilator. Likewise, because of the division of the after hold, the port division had only the cowl ventilator extending down nearly to the bottom like the rest, and the starboard division had only the exhaust ventilator. The hatches were, however, kept open as in the other case, and in each a sail ventilator was inserted. Such at least is the most reasonable construction to put upon the testimony in this case.

The holds of both vessels were filled to within not more than 24 inches of the ceiling, and the Perseveranca also carried a considerable deck cargo. During this trip on the Amazon the nuts were not shoveled and the climatic temperature was hot.

On arriving at Para the nuts were offered for sale. This was done as follows: An employé of Cohen, an auctioneer, took one basket of nuts from the forward hold and one from the after hold of each steamer, making four in all.

These he took from the top of the heap just beneath the hatch·opening. They were carried to the auctioneer's shop and exposed as samples of the cargo. Various proposed purchasers were at liberty to take from these baskets 100 nuts, crack them, and learn how great a percentage was bad. The nuts are then sold in accordance with the sample, subject, however, to a test by the buyer at the time of their delivery. This is the universal practice in the sale of nuts at Para and is the only available way of ascertaining their quality. It is universally accepted by persons dealing in such nuts as the proper way to buy and sell them.

This cargo amounted to 500 tons, some 25 tons being ex barge San Salvador, hereafter mentioned; and, as it was larger than is usual in Para, there were only three firms who would buy the nuts: First, the libelant's agents, Gruner & Co.; second the firm of R. O. Ahlers; and, third, the firm of Adelbert H. Alden. Each of these were bidders at the sale, but, thinking that they could do better by private competition, they abandoned the bidding when the price got to be about 15 mil reis. The auctioneer, seeing the larger bidders leave, withdrew the nuts from the sale and waited for a separate bidding. Both the libelant's firm represented by Gruner, and Alden's firm, represented by one Neale, bid 18 mil reis. Eventually the nuts were sold to the libelant for 18 mil reis, 200 reis. Before making the bids both Gruner and Neale had made a crack of the nuts from samples taken from the baskets. These had exhibited in no case more than 13 per cent. bad, and, as the sale was on a 15 per cent. basis, both bidders were contented. Neither found any "burnt" nuts in their examination. It does not appear exactly how many Gruner cracked except that he took a certain number from each basket; Neale took 100 nuts out of each of the four baskets. Before offering the nuts for sale, Cohen likewise made a crack which he found to average for both vessels 11½; the highest being 14 from the Perseveranca. It does not certainly appear how many nuts he used for his crack. He thought the cargo to be of good size and in good condition, but did find, unlike the other two, some "burnt" nuts in the samples which he examined.

After the cargo had been struck down to Gruner, he arranged with the claimant's agent, Pardo Vieira, that the nuts should be carried by the Sao Paulo, which was to furnish the lighters to take them from the river steamers aboard the ship itself. The first cargo from the lighters was brought to the Sao Paulo on the 5th of June, and the work was carried on continuously until she sailed, which was on the evening of the 8th. Stevedores employed by the claimant did the work, taking the nuts out in baskets which were dumped into a hectolitre measure that was afterwards emptied over the side into the lighter.

While the nuts were being loaded into the lighters to be carried aboard the Sao Paulo, Gruner had three men present who kept tally of the crack of the nuts, as they went over the side of the river steamer. Of these three, two were called and the third was in Manaos. Their names were Curado, Mendes, and Vinagre. The books in which they kept a part of the tally were put in evidence. Curado examined 1,450 hectolitres ex Sapucaia on the 4th of June, and on the 5th, 245 ex Sapucaia and 442 ex San Salvador. On the 6th Mendes examined 988 hectolitres ex Perseveranca and Vinagre 1,000, though the latter's tally books were not in evidence. On the 7th Mendes examined 1,645 hectos ex Perseveranca. The total number of hectolitres of which the tally was in evidence was 4,770, to which may be added Vinagre's 1,000, making in all 5,772 hectolitres, or somewhat more than half the cargo of all three vessels. Curado was 22 years old and had been four months in the employ of Gruner; this was his fourth crack at the most. He testifies that he examined 100 nuts for every 20 hectolitres, but his books represent the percentage to be for every 100. Mendes was 19 and had never examined nuts before. Machado, Gruner's foreman, was present at the time of the crack and said that it was made at every 100 to 200 hectolitres, and that the percentage of bad nuts was not more than 12. He had had a long experience, having been engaged in the business for 30 years, but it did not appear to what extent he actually took part in making the tally, though he appears to have personally cut the nuts and made some of the tests. He likewise testifies that there were no burnt nuts in either cargo. Two employés of Mendonca Ribeiro & Co.,

the seller, were also called, who testified that they made a test of the nuts as they were discharged. Their books were put in evidence, but in some way have now been lost, and the highest crack which the books showed was 11. Pereira, one of them, in only a few cases made the test himself; the foreman of the stevedores, perhaps Machado, cutting the nuts and counting the percentage while another man made the tally, so that the principal part of his work was to count the hectolitres. Oliveira, the other employé, found the crack above 10 but found no burnt nuts in the cargo, and, although he did not cut the nuts himself, they were cut in his presence by a sailor. He supervised 1,738 hectolitres and occasionally examined the nuts which were set aside as bad.

After the lighters were loaded from the river steamers, they were brought along the side of the Sao Paulo and the nuts were taken out and dumped into two of the four holds of that vesesl, No. 2 hold just forward of the engine space, and hold No. 4 just forward of the poop. The exact stowage and condition of the nuts when laden was a subject of dispute in the testimony and will be considered in the opinion. It is conceded, however, that some of the nuts were placed in the hold itself and some in the 'tween-decks. No other cargo was in either holds 2 or 4, but in the forward part of each 'tween-decks was placed some plants. The cubic capacity of the holds was: For hold No. 2, 4,799 hectolitres; for 'tween-decks No. 2, 6,573 hectolitres; hold No. 4, 5,485 hectolitres; 'tween-decks No. 4, 5,113 hectolitres. The capacity of lower hold No. 2 was 16,200 cubic feet; of the 'tween-decks No. 2, 22,150 cubic feet; of the lower hold No. 4, 18,640 cubic feet; and of the 'tween-decks No. 4, 17,550 cubic feet. The total cargo measured 10,083 hectolitres. The distribution of these nuts between the holds and the 'tween-decks is a matter of dispute between the parties. The steamer was discharged at New York on the 21st and 22d of June. The nuts were spread upon the dock and at once found to be in an injured condition.

Just what was done on the voyage is a matter in dispute, but it is conceded that no sail ventilators were put into either hatch. The ventilation of the hold was as follows: In the second hold there was one 12-inch cowl ventilator on the starboard side and one on the port side; the diameter of the cowl in each case was 21 inches and it was five feet above the deck. Into the 'tween-decks of No. 2 went one 18-inch cowl ventilator, the cowl of which was 30 inches in diameter, and two mushroom exhaust ventilators with a 12-inch pipe 13 feet from the after bulkhead. Into hold No. 4 there were two 12-inch cowl ventilators, one on the port and one on the starboard side, 18 inches from the forward bulkhead, the cowl of each of which was 18 inches in diameter. There was also one 14-inch cowl ventilator, the cowl of which was 36 inches in diameter, which was 25 feet from the after bulkhead and entered the hold through the poop. In the 'tween-decks of No. 4 went one 10-inch cowl ventilator, the cowl of which was 18 inches, which was 26 feet aft of the forward bulkhead, and two 6-inch ventilators through the bits of each side of the ship. Also there was one ventilator on the poop with a 20-inch pipe 25 feet from the after bulkhead. The hatches into hold No. 4 were 12 feet by 12 feet, and into hold No. 2, 13 by 14. Into the 'tween-decks of No. 2 they were 19 by 14. Calculations were made of the amount of air that would enter the holds through this ventilation system at various rates of speed, the result of which was that, at a speed of ten knots with no wind, the air in all the holds would be changed in 12 minutes.

The specific charges against the steamer by the libelant are as follows: That sufficient space was not left above the nuts; that the nuts were not shoveled; and that no sail ventilators were used in the hatches.

Mr. Harrington frankly concedes that the burden rests upon him of showing some negligence on the part of the ship, and that the only negligence would be in one of the three respects: The absence of sail ventilators, the improper stowage, and the failure to shovel the nuts. On the other hand, the claimant insists that, whatever the conditions on board the Sao Paulo, a fortiori the conditions on the Amazon would "cook" the nuts still more. When faced with the fact that a crack was made at Para, Mr. Haight insists that the crack was not such as to make it certainly represent the facts, because as to the crack of Gruner, Neale, and the auctioneer it came from baskets taken just below

the hatches, and as to the crack of Gruner's and Ribeiro's employés they are not reliable. Further he insists that the important testimony of Chaves é Silva shows that a disinterested person found not only 15 per cent. bad but 8 per cent. in addition in the process of becoming burnt. As to the sail ventilators, he insists that a sail ventilator contributes nothing more than any other ventilator of the same size, and that the proof distinctly shows that there was adequate ventilation without it.

To take up first the matter of shoveling the nuts, it appears by uncontradicted testimony that this was done twice a day for every day. Moreover, the testimony of the crew and officers is supported by that of several passengers. I do not mean that such passengers can say with certainty that shoveling was done twice each day throughout the voyage, but they do corroborate the statements that this was the fact by swearing that they frequently saw men shoveling nuts in the hold. Of course the cargo owner's position is one of great difficulty in such a matter and the testimony of the crew is certainly open to the suspicion of interest, but in this case I could not find that the shoveling did not take place without disbelieving a number of persons whose veracity was unimpeached. The issue is not like that of the headroom, on which men's recollections may well differ, and it is impossible to suppose that men could testify innocently that the nuts were shoveled twice a day, if such were not the fact. Either the shoveling took place or the witnesses were deliberately perjured. So that item of supposed negligence I will dismiss.

The second point is the item of ventilation. All the Booth captains, the only experts called, testify that it was the custom of their company at least in recent years to use sail ventilators, but they differed somewhat as to the importance they attributed to them. Thus Couch answers that he always carries wind sails and considers that they are the best to give proper ventilation. He concludes his testimony by saying that they are the "finest" things to have in the holds because you can always trim them to the wind and they are above everything on the deck; that they are practically much better than other ventilators. Steer, the other Booth captain called by the libelant, says that he uses wind sails of two feet six inches in diameter, the flaps of which extend out six feet, and the tube of which extends to within two feet of the top of the nuts. He says that he does not think that ordinary ventilators are half enough and so he supplies the deficiency by wind sails. This is strong testimony certainly, but the two Booth captains called by the claimant hardly bear it out. The first one, Coxon, had not had much recent experience in carrying nuts, but had carried them in the past and was now dock superintendent of the line. He thought that, with adequate headroom, wind sails would probably be unnecessary; that, however, wind sails did make a difference; that the difference between the cowl ventilator and the wind sail is merely in the size of the tube; and that on the whole, size for size, the stiff ventilators were better. On his cross-examination he reiterated that he did not regard them as necessary if there were ample other ventilation. Bennett, the other captain, said that he considered their use necessary because the more wind you could get down into the hold the better, but that it was not absolutely necessary if there were other ventilation. In such cases he would not consider them necessary. The only reason why they put them in was because it was a rule of the company.

In this view of the testimony I think it may fairly be said that although it is a customary precaution, and that the absence of the wind sails prima facie is negligence on the part of the ship, nevertheless it by no means necessarily follows that it is an absolute sine qua non of proper care. As Coxon says, the matter must be one of common sense, and the real question is as to the best way to get air into the hold. A sail ventilator having a tube of two feet six inches in diameter and an area of about five square feet will carry into the hold as much air as six ventilators having a tube 12 inches in diameter and an area of about four-fifths of a square foot, and it will carry down about three times as much as a ventilator having a diameter of 18 inches and a sectional area of 1⅘ square feet. However, this of course depends upon the relative size of cowl and wings, which is not given, and also it is plain enough, as Coxon says, that the straight metal shaft, other things being equal, will offer less resistance to the down-pouring air than the flexible sides of a

canvas tube. The two ventilators into hold No. 2 of the Sao Paulo would theoretically carry down only about half the air which a sail ventilator would carry down, and the single 18-inch cowl ventilator into the 'tween-decks of hold No. 2 would carry down only one-third of the air which would be carried into that hold by a sail ventilator. Similarly the three ventilators into the No. 4 hold would carry down not much more than one-half the air carried in by a sail ventilator, and the two 18-inch ventilators into the 'tween-decks of No. 4 would carry down only two-thirds of the ventilation of a sail ventilator. The two six-inch ventilators that went into the No. 4 'tween-decks hardly count. Two of the Booth captains seem to concede, and this must be accepted as in accordance with common sense, that if there be other sufficient ventilation, there is no magic in the wind sails. On the three Booth ships, the Cearense, Ucayali, and Dominic, the fixed ventilation to the holds and 'tween-decks was in all cases considerably less than that upon the Sao Paulo. In the case of the Cearense, with the exception of hatch No. 1, it was not more than half as much. In the case of the Ucayali, much less than that; and in the case of the Dominic, just about half. Moreover, the calculations of Martin, the well-known naval architect, of the amount of air that would pass into the holds and 'tween-decks at given rates of speed showed that at ten knots an hour, which was the ordinary speed of the vessel, a complete change of air would take place in the holds in every 12 minutes. This everybody concedes is enough, if it actually takes place, and Martin considered the ventilation quite enough for any cargo except bananas. If the speed against the wind were reduced to four knots an hour, the air would completely change about every half hour. Moreover, there is another consideration which ought not to be forgotten, which is that in the system of ventilation on board the Sao Paulo the heat was to go out of the hatches and the fresh air was to go in by the ventilators. To combine sail ventilators with cowl ventilators is to disturb that system somewhat, just how much is not ascertainable from the evidence.

While, therefore, the ship is primarily at fault for violating this customary regulation in the carriage of such nuts, I cannot find that there is a sufficient case made to show that under the circumstances that disregard caused any damage. No doubt it would have been safer to put up the sails, but we must remember the facts which I have enumerated: First, it is unsafe to compare by sectional area only the amount of air which will pass down a canvas tube with that which will pass down a steel tube; second, that a canvas tube would almost certainly disturb the upward current of hot air from the hatch upon which the ventilation in the Sao Paulo depended; third, that at least theoretically there was adequate ventilation in any case, according to Martin's testimony on that point, which stands uncontradicted; fourth, that the ships on which wind sails were used, so far as appears, had much less ventilation than the Sao Paulo; finally, that the matter after all is one of sound common sense in which the captains, who know the most about it, are by no means united in regarding the sail as a necessity. I do not think that the libelant has shown that the injury to the nuts was in any part caused by the absence of the ventilators.

The remaining question is whether adequate headroom was maintained over the nuts. Now there is some divergence of opinion between the Booth captains as to the amount which is necessary, but I think on the whole the best standard to apply is that of four feet, and this test the libelant substantially accepts. Was four feet of headroom left over the nuts in all the holds? There is undoubtedly plenty of testimony in the case that there was not. Those of the longshoremen discharging the vessel called by the libelants all testify that there was very much less than that. Moreover, it is evident that it is possible to stow the nuts with only two feet of headroom, and to trim them as well, because this was done on the Amazon steamers. Furthermore, there are some of the witnesses called by the claimant himself who put the headroom at less than four feet. This was the judgment of Lima, who thought that the distance was only 2½ feet in the No. 4 hold and that in the 'tween-decks it was not much more. Souza, another employé of the claimant, puts it at one meter or three feet three inches. Xavier says in hold No. 4 it was only high enough for men to crawl around on their knees,

which would be not over three feet. On the other hand, Mello says that in hold No. 2 the nuts were between one and two meters high, which would seem to be at least four feet. Silva says you could walk on the top of the nuts in hold No. 2. Alves says a man could walk easily walk on the nuts in hold No. 4, and he was five feet seven inches in height. Alfonso da Silva says that in the hold No. 2 you had to stoop in going under the beams but between them you could stand erect, and he was five feet nine inches. Willington says that between six and seven feet was left in all cases and also that he divided the entire cargo into four parts more or less equally according to the size of the holds. I think that Mr. Haight was justified in criticising the longshoremen of the libelant in that they all very positively testify that they were there on St. John's Eve when it was proved without question that at that time the ship was all discharged. It is inconceivable that they were all mistaken on a thing like that; they must have agreed with each other and miscalculated the date. This, combined with the fact that the names of none of them appeared on the time sheets of the claimant, satisfies me that their testimony is not reliable. On the other hand, I am disposed to attach importance to the testimony of Crooks. He talked quite frankly, saying that the highest ridge of the nuts in the 'tween-decks was not more than two feet from the ceiling, and that in other places the space was greater than his height. The average height in hold No. 2 he puts as between three feet six inches and four feet; in the No. 2 'tween-decks he thought the shortest space was three feet or three feet six inches; and in other places there was room for a man to work without difficulty. The conditions in hold No. 4 he found to be similar to those in hold No. 2. The longshoremen called by the claimant put the space as between four and five feet or more. The differences in all this testimony arise, I think, first from the necessary infirmity of human recollection as to such matters, and next to the inevitable discrepancy between estimates of space or time. No one who has had any adequate experience of trials can fail to be impressed with the astounding inaccuracy of the estimates of illiterate, and also of literate, witnesses in such matters. Especially this is true as to the estimates of time, and in regard to space men are only a little more reliable. When in addition it is remembered that the witnesses were probably speaking in some cases of the tops of the ridges, sometimes of the furrows, there is certainly an innocent interpretation possible for even the diversity that exists. However, with all this difference of testimony the fact stands out that men had spent four hours a day in the hold shoveling the nuts. It is quite clear that they could not have done this if the space was only two feet and a half. I think that Crooks' testimony is by far the most probable; i. e., that the nuts were not accurately trimmed, but that enough space was left in every hold to enable the men with some readiness to dig the necessary furrows. It is not as though the ship had been overladen, for confessedly the hold capacity was more than twice what she carried. It would have been an absurd and unreasonable distribution of the cargo to put more than four-fifths in the hold and leave only one-fifth in the 'tween-decks. It is very difficult to work with shovels in a less space than four feet; and, while much consideration for the crew is unfortunately not to be necessarily presupposed, it would be an almost wanton disregard of the ordinary economy of navigation, when there was plenty of space to use, not to distribute it with some degree of equality. The holds were 12 feet deep and the 'tween-decks 8. It is most likely that the captain's testimony was right and that he divided the cargo equally as nearly as he could. Mr. Harrington's calculations through Drake were based upon the testimony of those witnesses of the claimant who said that in both hold and 'tween-decks the space was five feet seven or nine inches. Now I do not believe that these men were right, and if I were obliged to guess at the height I should say that it was nearer four feet or three feet six inches, but it certainly must be clear that it cannot be legitimate to assume that these men were right in their estimate of the space in the 'tween-decks and then to show mathematically that the hold was overfilled. They were as wrong about the 'tween-decks as they were about the holds and their testimony must be considered throughout as inaccurate. In the face of all the diversity of testimony, I cannot find that the claimants have established that the stowage was imperfect.

This disposes of all three of the items of carelessness on which the libelant relies, but in fact their chief reliance still remains unassailed, which is that, in spite of all oral testimony, it is impossible that the nuts could have spoiled as they did upon the voyage if the necessary precautions had been maintained, and that therefore, if the nuts were sound when shipped, the precautions could not have in fact been taken, or at least they could not have been adequate. In spite of the burden of proof, Mr. Harrington thinks that the divergence of testimony and the source from which it comes would justify me in accepting that portion which is favorable to him and in disregarding that portion which is not, providing the nuts were sound when they started. If the crack at Para were necessarily accurate, there would be much force in his argument, but I do not think that this is so. In the first place it is very hard to see how the nuts could have been burnt during the 12 days they were on the Sao Paulo and not have been much worse burnt on the Amazon steamers. All the conditions were worse there than at sea; they were piled to within 24 inches of the deck; in many of the compartments there was absolutely no ventilation; in those in which there was any it was of small consequence; there was no pretense of shoveling; and the climatic temperatures were presumably higher than at sea. The libelant must concede all this but puts his faith on the crack at Para.

Now, as far as concerns the crack made by Neale, Gruner, and Cohen, I think that little can be inferred from it. Cohen's man says he took four baskets where it was most handy; that is, right beneath the hatch opening. As there had been a wind sail ventilator on the Amazon, the nuts which were under the hatches had been constantly fanned by the only air which any part of the steamer received at all. To get four baskets he did not have to dig deep and there is every reason to suppose that the only nuts which he got were those which had received plentiful ventilation. Even among these Cohen thought he discovered some burnt ones. I do not think, therefore, that there is any reason to suppose that these were accurate tests of the cargo. The test taken as the nuts went over the side of the river steamer was of a different character, and there can be no question but that if an accurate test, taken for every 100 hectolitres, in fact showed no greater damage than 10 or 11 per cent., the damage must have occurred upon the ship. The evidence depends wholly upon the employés of Gruner and Ribeiro. Gruner's men kept track together of only about 6,000 hectolitres. One of them had never examined nuts before, and the other had only been with Gruner four months. Their judgment of nuts which had begun to be burnt was certainly not the most reliable. Machado was with them and he testifies as to his recollection, but he kept no tally, nor do I understand that it was he who passed upon the condition of the nuts and told the two younger men what to tally. Had that been so, it would have been proper to attribute to the tally his own larger and sounder experience, but I cannot find it as a fair inference from the testimony. His testimony I cannot therefore accept as more than either his recollection of the tally itself or his remembered estimate from his own experience. If it be the first, it adds nothing to the testimony of the inexperienced men; if it be the second, it is subject to the general doubt of any such estimate not at the time embodied in permanent form and not, even when made, so thorough and complete as entitles it to the credibility of a tally.

Ribeiro had two employés present at the time whose tests are also given in evidence. Their duty, however, was to see that Gruner's men were not making the percentage too high, and they were interested, therefore, only in examining the nuts thrown aside as bad to see whether Gruner was not rejecting good nuts. If Gruner's men were accepting bad nuts, it was not an affair of theirs and they undoubtedly did not examine the nuts which passed as good. Thus Oliveira himself says that he personally examined the nuts which were set aside as bad. I do not think their testimony, therefore, is of any consequence upon the present issue.

On the other hand, the testimony of Seligmann's employé, Chaves ó Silva, is here pertinent. He made an independent examination of the nuts at some time not accurately fixed and found a percentage of 15 bad and of 8 which were, as he expresses it, beginning to get burnt. The witness James testifies

that in the first stage of burning the nuts change to a somewhat yellower color than the normal, and that this color increases as the process continues. Just what the condition was of those nuts which Chaves é Silva placed within the 8 per cent., it is impossible to say, but it is quite possible that Curado, Mendes, and Vinagre failed to notice a considerable change in color, which would have been apparent to a more experienced person. The libelant says that Chaves é Silva's test, the extent of which does not appear, may have been made only to answer his principal for the loss of a good bargain, but this seems to me a rather far-fetched explanation. Why should Seligmann have lost the bargain if he thought the nuts were good? He was concededly advised of the sale, attended the auction, and was actively in touch with the possibility of buying the cargo. A more reasonable explanation is that he let the bargain go because he found the nuts bad. It is quite true that the time of this examination does not appear except that it must necessarily have been between the 2d and the 8th of June, but I cannot see that anything turns on that. Seligmann's good faith seems to me to be strongly corroborated by the fact that he sent the result at once to his principal in New York. That Laing did not suspect Seligmann's good faith originally is, I think, pretty obvious from the fact he was alarmed by it when he got the news of the telegram. This is a matter upon which I do not lay great stress, yet from the whole of Laing's conduct it seems to me most likely that his concern about the cargo was due more to his knowledge of the telegram than to anything else. I mention this as important only as showing that, although the crack is prima facie accepted as an accurate test, Laing then recognized the possibility that it might have been wrong and was concerned at that possibility.

The testimony that when the nuts came over the side of the Sao Paulo they were either steaming or hot, I do not believe, because it is not substantiated by more reliable persons who were there at the time and who would, I think, have seen it, if it had happened. It is, however, the undisputed testimony, supported by that of disinterested passengers, that within a few days after the ship left Para the steam and stench from the holds became noticeable and the great bulk of the testimony is that both steam and stench decreased after the ship left the Barbadoes. Now it is hardly possible that the same treatment would have made the nuts steam during the early part of the voyage and cooled them off at the end. On the other hand, it is most likely that if they were delivered in a hot condition they would steam at first and proper treatment would cool them. Thus the Booth captains say they can deliver nuts in a better condition than they receive them. Both Woodward and Alexander, passengers on the Sao Paulo, noticed the vapor in the vicinity of the Barbadoes, but they cannot say on which side. The two Brazilian officers say they noticed the steam after the ship left Para but just when they do not state.

It is true that the goods are bought and sold on the Para crack, and indeed it is necessary that this should be the case, because if the buyer has had his opportunity to examine the nuts and has accepted them, it is too late for him thereafter to refuse because the examination was insufficient. On the other hand, it does not appear that in New York on the subsequent sale of the nuts the Para crack is accepted or that it is regarded as binding on third persons. It seems to me rather that the conclusiveness of this crack arises from the fact that it is all that the buyer can do at the time and that what he does then is necessarily a final acceptance. Therefore, in view of all these considerations, the inexperience of the men employed by Gruner, the position of Ribeira's employés upon the test, the crack of Chaves é Silva, the care of the nuts on the voyage, some of it attested by disinterested persons, the conceded conditions upon the Amazon, and the history of the nuts on the voyage down that river, I am disposed to regard the crack at Para with enough doubt to prevent its overcoming in my mind the other testimony which I have detailed at such length.

Perhaps if the burden had been upon the steamer to establish that the damage had been done on the Amazon, she would have failed, but the burden is the other way. It is upon the libelant to establish that it was not upon the Amazon, and under all the circumstances I am not satisfied that this was not the case. With all the confusion of testimony and the difficulty of reaching any certain conclusion as to what did happen, he must lose on whom

the burden rests. Fortunately, perhaps, it is not necessary to form a certain conclusion upon either side. I must confess that, with all its possibility of error, the Para crack still seems to me a stumbling block in the way of an affirmative conviction. All I mean here to say is that it was not necessarily accurate, and that, in view of the other proof, it does not carry conviction in my mind. It is undoubtedly a hard position for a cargo to be in, when it must prove what took place on the ship, but the ship is badly off also when it seeks to prove what was the condition of the cargo before it was delivered. Whatever the difficulties, I must take the law as I find it, and it requires the cargo to satisfy me upon the probabilities that there was lack of care. I am not satisfied.

Let a decree pass dismissing the libel and for the freight upon the cross-libel, with costs.

Harrington, Bigham & Englar, of New York City (Howard S. Harrington, of New York City, of counsel, and T. Catesby Jones and Kenneth M. Gibson, both of New York City, on the brief), for appellants.

Haight, Sandford & Smith, of New York City (Charles S. Haight, John W. Griffin, and J. Dexter Crowell, all of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

PER CURIAM. The damage was undoubtedly by "deterioration," which is among the exceptions in the bills of lading, and concededly the burden rests on the cargo owner to show that the ship's negligence caused or promoted such deterioration. The case is a very close one but on the whole we concur with Judge Hand's conclusion for the reasons he has expressed that such negligence is not established by a preponderance of proof.

Decrees affirmed, with costs of this appeal.